**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**Chattanooga Division**

| | |
|---|---|
| LISA BRYSON )<br><br>               Plaintiff, )<br><br>**v.** )<br><br>SPECIALTY NETWORKS, LLC, and )<br>SPECIALTY NETWORKS II, LLC, )<br><br>             Defendants. ) | **CIVIL ACTION NO.**<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

1.     This is a civil action seeking monetary damages and injunctive and declaratory relief from Specialty Networks, LLC and Specialty Networks II, LLC, (collectively, "Specialty Networks"), arising from their failure to safeguard certain Personally Identifying Information[1] and Protected Health Information[2] (collectively, "PII") of hundreds of thousands of their patients.

---

[1]  The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, Plaintiff is not asserting that every example of identifying information was compromised in the Data Breach.

[2]  Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia*, a health care provider who transmits any health information in electronic form in connection with a transaction covered by HIPAA. *Id. Covered entity*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa

Case 1:24-cv-00319-CLC-CHS     Document 1     Filed 09/20/24     Page 1 of 32     PageID #: 1

Consequently, those patients' PII—including their names, dates of birth, driver's license numbers, Social Security numbers, medical record numbers, treatment and condition information, diagnoses, medications, and health insurance information—was permanently compromised.[3] Plaintiff Lisa Bryson is one of the victims. She therefore brings this case against Specialty Networks for herself and a class of all others whose PII was compromised.

## NATURE OF THE ACTION

2. On or about August 15, 2024, Specialty Networks notified the public that it had "learned of a data security incident that may have impacted personal and/or protected health information belonging to certain current and former patients."[4] It ends up that the data security incident impacted a multitude of its patients, as Specialty Networks reported to the U.S. Department of Health and Human Services, Office for Civil Rights that the PII belonging to 411,037[5] of its patients was compromised (the "Data Breach").

3. Plaintiff and members of the Class have been significantly injured by the Data Breach and have incurred out-of-pocket expenses associated with the reasonable mitigation

---

[3] An exemplar Data Breach Notice transmitted from Specialty Networks to the Montana Department of Justice, Office of Consumer Protection is annexed hereto as Plaintiff's *Exhibit A*, which details the dataset that was compromised. It should be noted that by reporting the Data Breach to the Montana Office of Consumer Protection, Specialty Networks determined that Montana resident(s)' "unencrypted personal information was or is reasonably believed to have been acquired by an unauthorized person." 30-14-1704(1), MCA.

/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). Specialty Networks is clearly a "covered entity" and the data compromised in the Data Breach that this action arises out of is "protected health information", subject to HIPAA.

[4] *Special Networks Provides Notification of Data Security Incident*, PR NEWSWIRE, *available at* https://www.prnewswire.com/news-releases/specialty-networks-provides-notification-of-data-security-incident-302223893.html, (last accessed Sep. 18, 2024).

[5] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE FOR CIVIL RIGHTS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, (last accessed Sep. 18, 2024).

measures they were forced to employ. Plaintiff and the Class also now forever face an amplified risk of fraud and identity theft due to their sensitive PII falling into the hands of cybercriminals.

4.       On behalf of herself and the nationwide Class preliminarily defined below, Plaintiff brings causes of action sounding in negligence, *per se* negligence, invasion of privacy, breach of confidence, breach of contract, including breach of the covenant of good faith and fair dealing, trespass to chattels, bailment, unjust enrichment, and conversion. Plaintiff seeks damages and injunctive and declaratory relief arising from Specialty Networks's failure to adequately protect her highly sensitive PII.

## **PARTIES**

5.       Plaintiff Lisa Bryson is a natural person and citizen and resident of Bledsoe County, Tennessee, where she intends to remain. Plaintiff's PII was stored on Specialty Networks's data systems at all times material hereto.

6.       Defendant Specialty Networks, LLC is a Board Managed, Tennessee Domestic Limited Liability Company, with its principal place of business located at 1604 Gunbarrel Rd., Chattanooga, Tennessee 37421-3125. Specialty Networks, LLC's registered agent of process is Chambliss, Bahner & Stophel, P.C., 605 Chestnut Street, Suite 1700, Chattanooga, Tennessee 37450-0019. Defendant Specialty Networks II, LLC is a Manager Managed, Tennessee Domestic Limited Liability Company, with its principal place of business also located at 1604 Gunbarrel Rd., Chattanooga, Tennessee 37421-3125. Specialty Networks II, LLC's registered agent of process is Stephanie Fitch, 430 Chestnut Street, FL 4, Chattanooga, Tennessee 37402-4928.

7.       Upon information and belief, Defendants Specialty Networks, LLC and Specialty Networks II, LLC are alter-egos of one another, as they share the exact same principal business address, leadership, workforce and equipment. Both Defendants are collectively referred to as "Specialty Networks" hereinafter.

3

8.     Specialty Networks provides radiology information systems, digital transcription services, and Enterprise Practice Management solutions for medical facilities.[6] Specialty Networks specializes in PACS Storage, which stands for "Picture Archiving and Communication System. It's a medical imaging technology that provides economical storage, retrieval, management, distribution, and presentation of medical images."[7]

## JURISDICTION

9.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). The proposed nationwide Class includes over 400,000 people (well over the 100-member threshold). *See* 28 U.S.C. § 1332(d)(5)(B) (class must have at least 100 members). There is minimal diversity here because the proposed nationwide Class includes citizens of, *inter alia*, Montana, as Specialty Networks reported that 27 Montanans were affected by the Data Breach. (*See* 28 U.S.C. § 1332(d)(2)(A) (minimal diversity where "***any*** member of a class of plaintiffs is a citizen of a State different from any defendant") (emphasis added)). And the aggregate amount in controversy far exceeds $5,000,000.00, exclusive of interests and costs. (28 U.S.C. § 1332(d)(2).).

10.     This Court has general personal jurisdiction over Specialty Networks because Specialty Networks's principal place of business is in Tennessee, such that it is at home within the state.

---

[6] (Pl.'s Ex. A).
[7] *About PACS*, SPECIALTY NETWORKS, *available at* https://www.specialtynet.com/about, (last accessed Sep. 18, 2024).

## VENUE

11.     Venue is proper in this Court under 28 U.S.C. §§ 1391(a)(2), (b)(2) & (c)(2) because a substantial part of the events giving rise to the claims arise from Specialty Networks's business activities in this District.

## FACTUAL ALLEGATIONS

**A.     Plaintiff and the Class Members entrusted their PII to Specialty Networks**

12.     Plaintiff and the members of the Class are individuals who entrusted their PII to Specialty Networks and/or Specialty Networks's business associates[8].

13.     As a condition for receiving healthcare services, Class members were required by Specialty Networks to confide and make available to it, its agents, its employees, and its business associates, sensitive and confidential PII, including, but not limited to their names, dates of birth, driver's license numbers, Social Security numbers, medical record numbers, treatment and condition information, diagnoses, medications, and health insurance information.

14.     Specialty Networks acquired, collected, and stored a massive amount of PII of its patients and/or its business associates' patients.

15.     By obtaining, collecting, using, and deriving a benefit from those individuals' PII, Specialty Networks assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their PII from unauthorized disclosure.

16.     Plaintiff has taken reasonable steps to maintain the confidentiality of her PII. Plaintiff relied on Specialty Networks to keep her PII confidential and securely maintained, to use that information for business and treatment purposes only, and to make only authorized disclosures of that information.

---

[8] The term(s) "business associate(s)" as used herein, has the same meaning as the one ascribed by HIPAA, 45 C.F.R. § 160.103.

17. Plaintiff entrusted her PII to Specialty Networks and/or its business associates solely for the purpose of attaining healthcare services and arranging the payment therefor with the expectation and implied mutual understanding that Specialty Networks would strictly maintain the confidentiality of that information and safeguard it from theft or misuse.

18. Plaintiff would not have entrusted Specialty Networks and/or its business associates with her highly sensitive PII if she had known that Specialty Networks would not maintain it securely and protect it from unauthorized use or disclosure.

**B.    The security of patients' PII was compromised in the Data Breach**

19. Plaintiff was a patient of Specialty Networks and/or its business associates.

20. Prior to and/or contemporaneously with utilizing Specialty Networks's and/or its business associates' services, their agents provided Plaintiff with various disclosure statements regarding their privacy policies and their obligations under HIPAA to safeguard patients' PII–as they were required to do by law.[9]

21. As a prerequisite to receiving health services from Specialty Networks and/or its business associates, Plaintiff divulged her personal and sensitive PII to them, with the implicit understanding that it would be kept confidential. This understanding was based on all the facts and circumstances attendant to her receiving care, and the express, specific, written representations made by Specialty Networks and/or its business associates and their agents.

22. Plaintiff reasonably relied upon Specialty Networks's and/or its business associates' representations to her detriment and would not have provided her sensitive PII to Specialty Networks and its business associates but for their explicit and implicit promises to adequately safeguard that information.

---

[9] *See, e.g.*, 45 C.F.R. § 164.520(c)(2)(iii)(B).

23.     Specialty Networks admits that on December 18, 2023, it "became aware of unusual activity in [its] network…", so "[u]pon discovering this activity, [it] immediately took steps to secure the network and engaged a digital forensics and incident response firm to conduct an investigation to determine what happened and whether any data within [its] environment may have been impacted."[10] According to Specialty Networks, its "investigation revealed that on or around December 11, 2023, an unauthorized actor acquired certain data stored within [its] systems."[11]

24.     Despite becoming aware of the Data Breach no later than December 18, 2023, Specialty Networks failed to notify consumers of the Data Breach until *nearly eight months later*, on or about August 15, 2024.[12]

25.     Specialty Networks further explained that the unknown actor(s) gained access to PII including names, dates of birth, driver's license numbers, Social Security numbers, medical record numbers, treatment and condition information, diagnoses, medications, and health insurance information.[13]

26.     As a result of this Data Breach, the PII of approximately 411,037 of Specialty Networks' patients was compromised.[14]

27.     The Data Breach was preventable and a direct result of Specialty Networks's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patients' PII.

---

[10]  (Pl.'s Ex. A).
[11]  *See ibid.*
[12]  *Ibid.*
[13]  *Ibid.*
[14]  *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, *supra*, note 5.

## C. Healthcare providers like Specialty Networks are a prime target for cybercriminals

28. Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015.[15] The next year, that number increased by nearly 50%.[16] The following year, the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[17]

29. Healthcare data breaches have continued to rapidly increase. According to the 2019 Healthcare Information and Management Systems Society Cybersecurity Survey, 82 percent of participants reported having a significant security incident within the last 12 months, with a majority of those being caused by "bad actors."[18]

30. Healthcare providers "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[19]

---

[15] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, IDENTITY THEFT RESOURCE CENTER ("ITRC") (Jan. 19, 2017), https://www.idtheftcenter.org/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout/.

[16] *2017 Annual Data Breach Year-End Review*, ITRC, (Jan. 25, 2018), https://www.idtheftcenter.org/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf.

[17] *2018 End-of-Year Data Breach Report*, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[18] *2019 HIMSS Cybersecurity Survey*, HEALTHCARE INFORMATION AND MANAGEMENT SYSTEMS SOCIETY, INC. (Feb. 8, 2019), https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf.

[19] Benishti, Eyal, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH, (Apr. 4, 2019), https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

31.     The PII stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach— names, dates of birth, driver's license numbers, Social Security numbers, medical record numbers, treatment and condition information, diagnoses, medications, and health insurance information, etc.—is difficult, if not impossible, to change.

32.     This data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information… [is] worth more than 10x on the black market."[20] Likewise, the FBI has warned healthcare organizations that PII data is worth 10 times as much as personal credit card data on the black market.[21]

33.     PII data for sale is so valuable because PII is so broad, and it can therefore be used for a wide variety of criminal activity such as creating fake IDs, buying medical equipment and drugs that can be resold on the street, or combining patient numbers with false provider numbers to file fake claims with insurers.

---

[20] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[21] Stolen PHI health credentials can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924. Dark web monitoring is a commercially available service which, at a minimum, Specialty Networks can and should perform (or hire a third-party expert to perform).

34. The value of Plaintiff's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course. That is, of course, precisely what the cybercriminal(s) did here.

35. As storehouses of that lucrative information, healthcare providers are also highly targeted by cybercriminals because, "primarily due to budget and resources, [their] security systems are often less sophisticated and decentralized than those in other industries, such as financial services," making them an easier target.[22]

**D.** **Specialty Networks failed to sufficiently protect the PII that patients entrusted to it**

      i.   Specialty Networks failed to adhere to HIPAA

36. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.

37. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII is properly maintained.[23]

38. Specialty Networks's Data Breach resulted from a combination of inadequacies showing it failed to comply with safeguards mandated by HIPAA. Specialty Networks's security failures include, but are not limited to:

    a.   Failing to ensure the confidentiality and integrity of electronic PII that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

---

[22] Benishti, *supra* note 20.

[23] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

b.    Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PII in violation of 45 C.F.R. § 164.306(a)(2);

c.    Failing to protect against any reasonably anticipated uses or disclosures of electronic PII that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.    Failing to ensure compliance with HIPAA security standards by Specialty Networks's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.    Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.    Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.    Failing to effectively train all staff members on the policies and procedures with respect to PII as necessary and appropriate for staff members to carry out their functions and to maintain security of PII in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.    Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PII, in compliance with 45 C.F.R. § 164.530(c).

ii.    <u>Specialty Networks failed to adhere to FTC guidelines</u>

39.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[24] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Specialty Networks, should employ to protect against the unlawful exposure of PII.

---

[24] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Sep. 2, 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

40.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[25] The guidelines explain that businesses should:

    a.      protect the personal customer information that they keep;

    b.      properly dispose of personal information that is no longer needed;

    c.      encrypt information stored on computer networks;

    d.      understand their network's vulnerabilities; and

    e.      implement policies to correct security problems.

The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

41.     The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[26]

42.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[25] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Sep. 28, 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[26] *See Start with Security*, *supra* note 25.

43.     Specialty Networks's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

    iii.    <u>Specialty Networks failed to adhere to industry standards</u>

44.     As stated above, the healthcare industry continues to be a high value target among cybercriminals. In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches).[27] The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[28] As a result, both the government and private sector have developed industry best standards to address this growing problem.

45.     The United States Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that, "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."[29] DHHS highlights "several basic cybersecurity safeguards that can be implemented to improve cyber resilience which only require a relatively small financial investment, yet they can have a major impact on an organization's cybersecurity posture."[30] Most notably, organizations must properly encrypt PII in order to mitigate against misuse.

---

[27]   2018 End of Year Data Brach Report, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year Aftermath_FINAL_V2_combinedWEB.pdf.

[28]   *Ibid.*

[29]   *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

[30]   *Ibid.*

46.     The private sector has similarly identified the healthcare sector as particularly vulnerable to cyber-attacks both because of the of value of the PII that it maintains and because, as an industry, it has been slow to adapt and respond to cybersecurity threats.[31]

47.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Specialty Networks failed to adopt sufficient data security processes.

48.     Specialty Networks failed to adequately train its employees on even the most basic of cybersecurity protocols, which could have prevented the Data Breach.

49.     Specialty Networks's failure to implement these rudimentary measures made it an easy target for the Data Breach that came to pass.

**E.      Plaintiff and the Class Members were significantly harmed by the Data Breach**

50.     As discussed above, PII is among the most sensitive, and personally damaging information. A report focusing on breaches in the healthcare industry found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000.00" per person, and that the victims were further routinely forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage.[32]

51.     Victims of medical identity theft can suffer significant financial consequences. "In some cases, they [must pay] the healthcare provider, repa[y] the insurer for services obtained by the thief, or . . . engage[] an identity service provider or legal counsel to help resolve the incident and prevent future fraud."[33]

---

[31]    *10 Cyber Security Best Practices For the Healthcare Industry*, NTIVA (Jun. 19, 2018), https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry.

[32]    Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[33]    *Fifth Annual Study on Medical Identity Theft*, PONEMON INSTITUTE LLC 1 (Nov. 18, 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65.

52. Moreover, nearly half of identity theft victims lost their health care coverage as a result of a data breach incident, nearly one-third reported that their premiums went up, and forty percent never resolved their identity theft at all.[34]

53. "Unfortunately, by the time medical identity theft is discovered, the damage has been done. Forty percent of consumers say that they found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that thieves incurred in their name. As a result, the consequences of medical identity theft are frequently severe, stressful and expensive to resolve."[35]

54. Moreover, resolution of medical identity theft is time consuming to remedy. "Due to HIPAA privacy regulations, victims of medical identity theft must be involved in the resolution of the crime. In many cases, victims struggle to reach resolution following a medical identity theft incident."[36] Consequently, they remain at "risk for further theft or errors in [their] healthcare records that could jeopardize medical treatments and diagnosis."[37]

55. As a result of the Data Breach, Plaintiff now faces, and will continue to face, a heightened risk of identity theft and fraud for the rest of her life.

56. As a long-standing member of the healthcare community, Specialty Networks knew or should have known the importance of safeguarding patient PII entrusted to it and of the foreseeable consequences of a breach. Despite this knowledge, however, Specialty Networks failed to take adequate cyber-security measures to prevent the Data Breach from happening.

---

[34] *Ibid.*
[35] *The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches*, EXPERIAN (Apr. 13, 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[36] *Ibid.*
[37] *Ibid.*

57.     Specialty Networks has not provided any compensation to patients victimized in the Data Breach and has not offered to provide any assistance or compensation for the costs and burdens—current and future—associated with the identity theft and fraud resulting from the Data Breach.

58.     Even if Specialty Networks did reimburse Plaintiff for the harm she suffered, it is incorrect to assume that reimbursing a victim of the Data Breach for financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[38]

59.     As a result of Specialty Networks's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer significant damages. They have suffered or are at increased risk of suffering:

a.      The loss of the opportunity to control how their PII is used;

b.      The diminution in value of their PII;

c.      The compromise, publication and/or theft of their PII;

d.      Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud, including the purchase of identity theft protection insurance and detection services;

e.      Lost opportunity costs and lost wages associated with the time and effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f.      Delay in receipt of tax refund monies;

---

[38] *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUSTICE 10, 11 (Jan. 27, 2014), https://www.bjs.gov/content/pub/pdf/vit12.pdf.

g.      Unauthorized use of stolen PII;

h.      The continued risk to their PII, which remains in the possession of Specialty Networks and is subject to further breaches so long as Specialty Networks fails to undertake appropriate measures to protect the PII in its possession; and

i.      Current and future costs related to the time, effort, and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members.

60.     Plaintiff has already incurred injury and harm as a result of the Data Breach.

61.     For example, Plaintiff received notice that an imposter attempted to take out a loan in her name—using her compromised PII—on or about June of 2024. In an effort to mitigate the heightened risk of identity theft and fraud that she now faces, Plaintiff subscribes to an online credit monitoring service that provides identity theft protection services. While this credit monitoring service will allow Plaintiff to monitor her credit reports to determine whether suspicious activity has occurred, it is powerless to stop identity theft in advance and does not indemnify her from, or insure her against, the harm caused by the Data Breach.

62.     Plaintiff has also been forced, and will continue to be forced, to expend time and effort in order to mitigate the harm she has suffered on account of the Data Breach.

63.     For example, Plaintiff has expended time and effort responding to this data breach and she will have to monitor her identity and credit reports periodically, in addition to gathering documentation.

## CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this case on her own behalf for the following proposed class ("the Class"), seeking both damages and equitable/forward-looking relief:

**All individuals whose PII was compromised in Specialty Networks's Data Breach.**

65.     Excluded from the Class are the officers, directors, and legal representatives of Specialty Networks and the judges and court personnel in this case and any members of their immediate families.

66.     This action is properly maintainable as a class action under Fed. R. Civ. Proc. 23.

67.     The Class is so numerous that joinder of all members would be impracticable. Upon information and belief, the Class consists of more than 400,000 members, spread across numerous states.

68.     There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a.     Whether and to what extent Specialty Networks had a duty to protect the PII of Plaintiff and the Class;

b.     Whether Specialty Networks failed to adopt the practices and procedures necessary to adequately safeguard the information compromised in the Data Breach;

c.     Whether Specialty Networks adequately and accurately informed Class Members that their PII had been compromised;

d.     Whether Class Members are entitled to actual damages, statutory damages, and/or punitive damages as a result of Specialty Networks's wrongful conduct; and

e.     Whether Plaintiff and the Class are entitled to restitution as a result of Specialty Networks's wrongful conduct.

69.     Plaintiff's claims are typical of those of other Class members because her PII, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiff, like all Class members, was injured by Specialty Networks's uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of other Class members arise from the same operative facts and are based on the same legal theories.

70.     Plaintiff will fairly and adequately represent and protect the interests of the Class in that she has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

71.     The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the questions identified in Paragraph 68 above.

72.     A class action would provide substantial benefits over other methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

73.     The litigation of the claims brought herein is manageable. Specialty Networks's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

74.     Adequate notice can be given to Class members directly using information maintained in Specialty Networks's records.

75. This proposed class action does not present any unique management difficulties.

76. Class certification is also appropriate under Rule 23(b)(2) because Specialty Networks has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE and/or NEGLIGENCE *Per Se*
### (on behalf of the Nationwide Class)

77. Plaintiff repeats and incorporates by reference the preceding paragraphs.

78. As a condition of receiving healthcare services, Plaintiff and Class members were obligated to provide Specialty Networks and/or its business associates their PII.

79. Plaintiff and the Class members entrusted their PII to Specialty Networks and its business associates with the understanding that Specialty Networks would safeguard it.

80. Specialty Networks had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class members could and would suffer if the PII were wrongfully disclosed.

81. Specialty Networks had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, *inter alia*, designing, maintaining and testing Specialty Networks's security protocols to ensure that Plaintiff's and Class members' PII in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately trained on cyber security measures regarding patient PII.

82. Plaintiff and the Class members were the foreseeable and probable victims of any inadequate security practices and procedures that Specialty Networks employed. Specialty

20

Networks knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, that it had inadequately trained its employees, and that its security protocols were insufficient to secure the PII of Plaintiff and Class members.

83.     Specialty Networks's own conduct created a foreseeable risk of harm to Plaintiff and Class members. Specialty Networks's misconduct included, but was not limited to, its failure to take the steps to prevent the Data Breach as set forth herein. Specialty Networks's misconduct also included its decision to not comply with industry standards for the safekeeping and authorized disclosure of patient PII.

84.     Section 5 of the FTC Act prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Specialty Networks, of failing to use reasonable measures to protect PII/PHI. The FTC publications and orders described above also form part of the basis of Specialty Networks's duty in this regard.

85.     Specialty Networks further violated Section 5 of the FTC Act by failing to use reasonable measures to protect patient PII/PHI and not complying with applicable industry standards, as described herein. Specialty Networks's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class members.

86.     Specialty Networks further violated HIPAA, as more specifically described, *supra*.

87.     Specialty Networks further violated the Tennessee Identity Theft Deterrence Act, T.C.A. § 47-18-2107, by failing to notify Plaintiff and Class Members of the Data Breach within 45 days from the discovery or notification of the breach.

88.     Plaintiff and the Class members had no ability to protect their PII once they entrusted it to Specialty Networks and/or its business associates.

89.     Specialty Networks has admitted that Plaintiff's and the Class members' PII was wrongfully disclosed to cybercriminals as a result of the Data Breach.

90.     Specialty Networks breached its duty to Plaintiff and the Class by failing to exercise ordinary and reasonable care in protecting and safeguarding their PII while it was within Specialty Networks's possession or control.

91.     Specialty Networks unlawfully breached its duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent unauthorized dissemination of its patients' PII.

92.     Specialty Networks also unlawfully breached its duty to adequately disclose to Plaintiff and Class members the existence and scope of the Data Breach.

93.     But for Specialty Networks's willful and wanton misconduct and/or gross negligence, Plaintiff's and Class Members' PII/PHI would not have been compromised.

94.     As a result of Specialty Networks's negligence, Plaintiff and the Class have suffered and will continue to suffer damages and injury including, but not limited to, out-of-pocket expenses associated with mitigating against the heightened risk of identity theft and fraud caused by the Data Breach; the time and costs associated with remedying identity theft and fraud fairly attributable to the Data Breach; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

95.     These harms are directly and proximately caused by the Data Breach.

## SECOND CLAIM FOR RELIEF
## INVASION OF PRIVACY
## (on behalf of the Nationwide Class)

96.     Plaintiff repeats and incorporates by reference the preceding paragraphs.

97.     Plaintiff and Class members took reasonable and appropriate steps to keep their PII confidential from the public.

98.     Plaintiff's and Class members' efforts to safeguard their own PII were successful, as their PII was not known to the general public prior to the Data Breach.

99.     Plaintiff and Class members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

100.    Specialty Networks owed a duty to its patients, including Plaintiff and Class members, to keep their PII confidential.

101.    The unauthorized release of PII, especially PHI, is highly offensive to a reasonable person.

102.    Plaintiff's and Class members' PII is not of legitimate concern to the public.

103.    Specialty Networks knew or should have known that Plaintiff's and Class members' PII was private, as Specialty Networks is a "covered entity" subject to HIPAA.

104.    Specialty Networks publicized Plaintiff's and Class members' PII, by communicating it to cyber criminals who had no legitimate interest in this PII and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web.

105.    Indeed, not only is Plaintiff's and Class members' PII traveling the dark web, but it is being used to commit fraud; it is being disseminated amongst, *inter alia*, merchants, creditors, health care providers and governmental agencies.

106.     It is therefore substantially certain that the Plaintiff's and the Class members' PII is rapidly becoming public knowledge – among the community writ large – due to the nature of the ransomware campaign that procured it, and the identity theft that it is designed for.

107.     Unless and until enjoined, and restrained by order of this Court, Specialty Networks's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Specialty Networks's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class members' privacy by Specialty Networks.

**THIRD CLAIM FOR RELIEF**
**BREACH OF CONFIDENCE**
**(on behalf of the Nationwide Class)**

108.     Plaintiff repeats and incorporates by reference the preceding paragraphs.

109.     Plaintiff and Class members conveyed confidential and novel information to Specialty Networks, their PII.

110.     Specialty Networks had knowledge that the PII was disclosed to it in confidence.

111.     There was an understanding between Specialty Networks and Plaintiff and Class members that the confidence of their PII be maintained.

112.     Specialty Networks breached the confidences Plaintiff and Class members formed with it by disclosing their PII to cybercriminals.

113.     Unless and until enjoined, and restrained by order of this Court, Specialty Networks's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Specialty Networks's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class members have no adequate remedy at law for the

injuries that they will sustain in that a judgment for monetary damages will not prevent further breaches of confidence by Specialty Networks.

## **FOURTH CLAIM FOR RELIEF**

### **BREACH OF CONTRACT INCLUDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (on behalf of the Nationwide Class)**

114. Plaintiff repeats and incorporates by reference the preceding paragraphs.

115. Specialty Networks and/or its business associates offered to provide healthcare services to Plaintiff and Class members in exchange for payment.

116. Plaintiff and the Class accepted Specialty Networks's and/or its business associates' offer to provide healthcare services by paying for them and receiving said treatment.

117. Specialty Networks and/or its business associates required Plaintiff and Class members to provide their PII, including names, city, state, and zip code, email addresses, telephone numbers, dates of birth, gender, service date, location and next appointment date in order to receive services from Specialty Networks and/or its business associates.

118. Plaintiff and Class members exchanged valuable consideration – money – with Specialty Networks and/or its business associates for goods and services, a crucial part of which was Specialty Networks's and/or its business associates' promises to protect their PII from unauthorized disclosure.

119. In its privacy policies, Specialty Networks expressly promised Plaintiff and the Class that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

120. Necessarily implicit in the agreement between Specialty Networks and its patients, including Plaintiff and Class members, was Specialty Networks's obligation to use such PII for

business and treatment purposes only, to take reasonable steps to secure and safeguard that PII, and not make disclosures of the PII to unauthorized third parties.

121.    Further implicit in the agreement, Specialty Networks was obligated to provide Plaintiff and the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PII.

122.    Plaintiff and the Class would not have entrusted their PII to Specialty Networks and/or its business associates in the absence of such agreement with Specialty Networks.

123.    Moreover, upon information and belief, Specialty Networks entered into agreements with its business associates regarding Plaintiff's and Class members' PII, for which Plaintiff and the Class were intended third-party beneficiaries.

124.    Specialty Networks materially breached the implied contract(s) they had entered with Plaintiff and Class members by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Specialty Networks further breached the implied contracts with Plaintiff and Class members by:

    a.    Failing to properly safeguard and protect Plaintiff's and Class members' PII;

    b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

    c.    Failing to ensure the confidentiality and integrity of electronic PII that Specialty Networks created, received, maintained and transmitted in violation of the FTC Act and HIPAA.

125.    The damages sustained by Plaintiff and Class members as described above were the direct and proximate result of Specialty Networks's material breaches of its agreements.

126.     Plaintiff and Class members have performed as required under the relevant agreements, or such performance was waived by the conduct of Specialty Networks.

127.     Under the laws of Tennessee, good faith is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

128.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

129.     Specialty Networks failed to promptly advise Plaintiff and the Class of the Data Breach.

130.     In these and other ways, Specialty Networks violated its duty of good faith and fair dealing.

131.     Plaintiff and members of the Class have sustained damages as a result of Specialty Networks's breaches of the Contract, including breaches of the Contract through violations of the covenant of good faith and fair dealing.

**<u>FIFTH CLAIM FOR RELIEF</u>**
**TRESPASS TO CHATTELS**
**(on behalf of the Nationwide Class)**

132.     Plaintiff repeats and incorporates by reference the preceding paragraphs.

133.     Plaintiff and the Class entrusted their PII to Specialty Networks and/or its business associates with the understanding that it would keep that information confidential.

134.     Specialty Networks intentionally dispossessed the Plaintiff and the putative members of the Class of their PII and/or used or intermeddled with the Plaintiff and the putative members of the Class's possession of their PII, when it allowed cybercriminals to access it, going far beyond the bounds of any consent Plaintiff and the Class bestowed upon Specialty Networks and/or its business associates.

135.     As explained at length above, Plaintiff and the Class members were damaged thereby.

### SIXTH CLAIM FOR RELIEF
**BAILMENT**
**(on behalf of the Nationwide Class)**

136.     Plaintiff repeats and incorporates by reference the preceding paragraphs.

137.     Plaintiff, the Class, and Specialty Networks contemplated a mutual benefit bailment when the Plaintiff and putative members of the Class transmitted their PII to Specialty Networks and/or its business associates solely for treatment and the payment thereof.

138.     Plaintiff's and the Class's PII was transmitted to Specialty Networks and/or its business associates in trust for a specific purpose (treatment), with an implied contract that the trust was to be faithfully executed, and the PII was to be accounted for when the special purpose was accomplished.

139.     Specialty Networks was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiff's and the Class's PII.

140.     Plaintiff's and the Class's PII was used for a different purpose than the Plaintiff and the Class intended, for a longer time period and/or in a different manner or place than the parties intended.

141.     As explained at length above, Plaintiff and the Class were damaged thereby.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**UNJUST ENRICHMENT**
**(on behalf of the Nationwide Class)**

142.     Plaintiff repeats and incorporates by reference the preceding paragraphs.

143.     In the alternative to the claims alleged above, Plaintiff alleges that she has no adequate remedy at law and brings this unjust enrichment claim on behalf of herself and the Class Members.

144.     Plaintiff and Class Members conferred a monetary benefit on Specialty Networks in the form of payment for healthcare services. Plaintiff and Class Members also provided their PII to Specialty Networks.

145.     The money that Plaintiff and Class Members paid, directly or indirectly, to Specialty Networks should have been used by it, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

146.     As a result of Specialty Networks's conduct described herein, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between healthcare services associated with the reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and the inadequate healthcare services without reasonable data privacy and security practices and procedures that they received.

147.     Under principles of equity and good conscience, Specialty Networks should not be permitted to retain money belonging to Plaintiff and Class Members because Specialty Networks

failed to use that money to implement the reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal and state law, and industry standards and best practices.

148. Specialty Networks should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by Specialty Networks.

149. A constructive trust should be imposed upon all unlawful or inequitable sums received by Specialty Networks traceable to Plaintiff and Class Members.

## EIGHTH CLAIM FOR RELIEF
### CONVERSION
**(on behalf of the Nationwide Class)**

150. Plaintiff repeats and incorporates by reference the preceding paragraphs.

151. At all times relevant hereto, Plaintiff and Class Members had ownership rights to their PII.

152. Specialty Networks engaged in the wrongful act of disposing of the PII by giving cyber criminals access to it.

153. As explained at length above, Plaintiff and the Class were damaged thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, LISA BRYSON, individually, on behalf of herself and all others similarly situated, requests the following relief:

A. An Order certifying this action as a nationwide class action and appointing Plaintiff as Class representative and her counsel as Class counsel;

B.      A mandatory injunction directing Specialty Networks to safeguard the PII of Plaintiff and the Class hereinafter adequately by implementing improved security procedures and measures;

C.      A mandatory injunction requiring that Specialty Networks provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII to unauthorized persons;

D.      An award of compensatory, restitutionary, punitive, exemplary, and statutory damages, as permitted by law.

E.      An award of attorneys' fees and costs;

F.      An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law; and

G.      Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 20, 2024                    Respectfully submitted,

*/s/ Joe P. Leniski, Jr.*

Joe P. Leniski, Jr. (TN BPR  22891)
**HERZFELD, SUETHOLZ, GASTEL, LENISKI & WALL PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, Tennessee 37203
Telephone: (615) 800-6225
Email: joey@hsglawgroup.com

Peter J. Jannace*
**HERZFELD, SUETHOLZ, GASTEL, LENISKI &
WALL PLLC**
515 Park Avenue
Louisville, Kentucky 40208
Telephone: (502) 636-4333
Email: peter@hsglawgroup.com

*PHV Application Pending*

*Attorneys for Plaintiff*